# EXHIBIT A

I156scos

| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| | SOUTHERN DISTRICT OF NEW YORK |
| 2 | ------------------------------x |
| 3 | UNITED STATES OF AMERICA, |
| 4 | v.                            06 CR 988(LTS) |
| 5 | GERALD SCOTT, |
| 6 | Defendant. |
| 7 | ------------------------------x |

```
8                                         New York, N.Y.
                                          January 5, 2018
9                                         12:15 p.m.

10
     Before:
11
                         HON. LAURA TAYLOR SWAIN,
12
                                          District Judge
13

14                           APPEARANCES

15   GEOFFREY S.  BERMAN
          Interim United States Attorney for the
16        Southern District of New York
     CATHERINE E. GEDDES
17        Assistant United States Attorney

18   FEDERAL DEFENDERS OF NEW YORK
          Attorneys for Defendant
19   JENNIFER E. WILLIS
     MATTHEW B. LARSEN
20

21

22

23

24

25
```

I156scos

1              (In open court; case called)

2              MS. GEDDES:  Good afternoon, your Honor.  Catherine

3    Geddes for the United States.

4              THE COURT:  Good afternoon, Ms. Geddes.

5              MS. WILLIS:  Good afternoon, your Honor.  Jennifer

6    Willis, Federal Defenders of New York.  Joining me at counsel

7    table is Matt Larsen also with the Federal Defenders of New

8    York.

9              THE COURT:  Good morning, Ms. Willis, Mr. Larsen and

10   Mr. Scott.

11             Mr. Scott, are members of your family in court today?

12             THE DEFENDANT:  Yes.

13             THE COURT:  Good morning to all of you.

14             We're here today for the adjourned resentencing of Mr.

15   Scott, and for the reasons explained in the June 2nd, 2017

16   memorandum opinion order issued by this Court.

17             I have received and reviewed the presentence

18   investigation report, which is dated January 11th, 2008,

19   including the recommendation and addendum.  I have also

20   received and reviewed a December 11th, 2017 defense submission

21   which was accompanied by four letters of support from family

22   members and a former employer of Mr. Scott, a letter from

23   Mr. Scott himself, a letter detailing a reentry plan and

24   educational documentation.  I have also reviewed a second

25   letter dated December 8th, 2017 from Mr. Scott and defense

I156scos

1  counsel's supplemental submission dated January 3rd, 2018.

2           I have reviewed the government's December 11th, 2017

3  submission as well as the government's December 27th, 2017

4  supplemental submission.

5           Are there any other written submissions that the

6  parties are intending to consider in connection with the

7  sentencing?

8           MS. GEDDES:  No, your Honor.

9           MS. WILLIS:  No, your Honor.

10          THE COURT:  Thank you.

11          Ms. Geddes, would you make your statement regarding

12  victim identification and notification.

13          MS. GEDDES:  Yes, your Honor.  Our victim impact

14  office has notified the victims of the offense of today's

15  proceeding.

16          THE COURT:  Thank you.

17          Ms. Willis, have you read the presentence report and

18  discussed it with Mr. Scott?

19          MS. WILLIS:  I have, your Honor.

20          THE COURT:  Mr. Scott, have you yourself reviewed the

21  presentence report and discussed it with your attorney?

22          THE DEFENDANT:  Yes, your Honor.

23          THE COURT:  Ms. Willis, would you like to speak

24  further to the career offender guidelines issue now?

25          MS. WILLIS:  Your Honor, Attorney Larsen from my

I156scos

1    office is prepared to address that portion of the argument.

2            THE COURT:  Very good.

3            You're submission was second and so perhaps I should

4    ask Ms. Geddes to lead off at this point.

5            MS. GEDDES:  Yes, your Honor.  I just wanted to

6    address two points that were raised in the defendant's

7    January 3rd submission.  The first is that the defendant claims

8    in their submission that assault requires an overt act and

9    cannot be accomplished by omission; but that simply is not the

10   case.  It is well settled that failure to act can give rise to

11   assault or manslaughter or murder of any of these charges just

12   as action can if there is a duty to act and whatever requisite

13   mental state is required.  Here penal law and lawful penal code

14   both include omission to perform acts as a basis for criminal

15   liability.

16           THE COURT:  Criminal liability for assault?

17           MS. GEDDES:  Criminal liability in general.  It is the

18   general provisions of New York Penal Law 15.10 and Model Penal

19   Code 2.01.  They don't specifically mention omission in the

20   assault or murder or those specific statutes, but the one I

21   cited -- the ones I have cited are generally applicable to all

22   of the statutes for all of the specific crimes.

23           THE COURT:  And so the statute of the Model Penal Code

24   provision say that any codified crime can be committed by

25   omission?

I156scos

         MS. GEDDES:  If there is a duty to act.  If there is a

legal duty, for example, in these cases the parents' legal duty

to provide care for their children, in those cases the omission

is just as much a part of the crime as an overt act as an

affirmative act.

         THE COURT:  What were those citations again?

         MS. GEDDES:  It is New York Penal Law 15.10 and Model

Penal Code 2.01.

         THE COURT:  Did you bring copies for the Court and

defense counsel to look at?  It seems to me back where I was --

well, not quite back where I was on December 22nd but

uncomfortably close to where I was on December 22nd.

         MS. GEDDES:  I do not have copies of those, your

Honor.  I apologize.

         THE COURT:  You'll have to hold on while I look them

up.  Just as you should always come to court prepared with your

copies of rules if you are going to be relying on specific

cases or citations, you should be prepared to provide them to

the Court and in advance to defense counsel, and preferably

having received defense counsel's submission on schedule two

days ago, which I spent a lot of time with, and I am sure that

you did based on what you said now.  If you had something else

to add to the canon specific and not by way of argument of

citations that you had already offered, you should have asked

for permission to send a supplemental submission or just sent

I156scos

1    these materials out.

2         Do you understand that?

3         MS. GEDDES:  I do, your Honor.

4         THE COURT:  Will you change your behavior in the

5    future in this regard?

6         MS. GEDDES:  Yes, your Honor.

7         THE COURT:  Thank you.

8         You can have a seat for a moment and I will print them

9    out so that Ms. Willis and Mr. Larsen will get them as well.

10        There are two documents, a one-page document and

11   two-page document to go to each table.

12        THE DEPUTY CLERK:  Okay.

13        THE COURT:  You may proceed with your argument,

14   Ms. Geddes.

15        MS. GEDDES:  Thank you, your Honor.

16        Aside from the New York Penal Law and the Model Penal

17   Code, which mention omissions as a basis for liability, the

18   *Lafave* treatise that the parties both cited also notes -- that

19   specifically notes that murder and manslaughter could be

20   committed by omission when there is a duty to act and the

21   Second Circuit --

22        THE COURT:  Does it say anything about assault?

23        MS. GEDDES:  The *Lafave* treaties section on battery

24   mentions that it can be -- one of the elements it lists is acts

25   or omission and it describes how a lot of statutes conflate

I156scos

1   assault and battery.

2            I will just mention one second Circuit Case.

3            THE COURT:  Let's get your list of citations.

4            MS. GEDDES:  Sure.

5            THE COURT:  So the section of *Lafave* treatise is what?

6            MS. GEDDES:  16.2 is the definition of battery that

7   mentions act or omission, and 6.02 mentions that murder and

8   manslaughter could be committed by omission to act when there

9   is a duty and it mentions as an example that a parent who

10  doesn't call a doctor for a sick child and says that that

11  parent could be guilty of criminal homicide.

12           THE COURT:  Next.

13           MS. GEDDES:  The Circuit Case is *United States v.*

14  *Sabhnani*, 599 F.3d 215 at page 237 from 2010 references a

15  general principle -- the general principle that omissions may

16  serve for the basis of criminal liability only if there is an

17  affirmative duty to act.  It is not otherwise relevant to these

18  issues, but it is just an example of the Second Circuit

19  recognizing that an omission just as much as an act can give

20  rise to criminal liability when there is a duty as in the case

21  of parents in the manslaughter case.

22           The defense doesn't cite any cases that disagree with

23  these principles.  The cases that they cite such as *Garcia*,

24  *Jimenez* and *Cooper* are only addressing whether recklessness is

25  sufficient for aggravated assault not whether an omission can

I156scos

 1    lead to aggravated assault.  The Court uses the word "act"

 2    because most of these are committed by affirmative acts.  It is

 3    not commenting on that it has to an affirmative act as opposed

 4    to omission.  Similarly, in the *Perez* case it is just

 5    addressing whether creating a substantial danger of serious

 6    injuries is sufficient and finds that there has to be an actual

 7    injury or death.  It also is not saying that there has to be an

 8    affirmative act and that an omission is not sufficient.

 9            So while this force or act versus omission discussion

10    is relevant to the earlier question in this case, which is

11    whether manslaughter has as an element the use or attempted use

12    or threatened use of physical force under the force clause,

13    that is not a requirement of the enumerated felony clause.

14    There is no requirement that it be use of force, just that the

15    enumerated felony match here what we have as first degree

16    manslaughter under New York law.  This is recognized as well in

17    the *Chrzanoski* case that this Court cited in its June 2nd

18    opinion where the Court says, The intentional causation of

19    injury does not necessarily involve the use of force.  There is

20    a distinction between causing injury, which can be done by

21    omission versus the use of force, which in that case this Court

22    had found first degree manslaughter does not involve use of

23    force, but that does not answer the question whether it

24    involves intentional causation of injury.  In fact, the

25    Chrzanoski case even mentions a doctor who deliberately

I156scos

withholds vital medicine from a sick patient as an example of
causing injury -- intentionally causing injury without the use
of force.

          The second point I wanted to make in response to the
defendant's January 3rd letter is that they claim that
manslaughter in New York punishes a parent's failure to protect
his child, but that is not a complete reading of what the
manslaughter statute punishes.  The manslaughter statute
punishes a parent who intends to cause a serious physical
injury and then causes that injury.  So that is different from
the Tennessee statutes that are cited in the defendant's letter
where there is no intent to cause injury.  The intent to cause
injury here fits under aggravated assault and takes it out of
statutes like the ones in Tennessee.

          I will also note that the defendant doesn't give any
alternative generic definition of aggravated assault than the
one that the government listed, which is from the Model Penal
Code, and similar cases in the government's December 27th
letter.  Aggravated assault occurs when a defendant attempts to
cause serious bodily injury or causes such injury purposefully
or knowingly.  And the manslaughter convictions required proof
that the defendant intended to cause serious physical injury
and then caused the death.  So the New York first degree murder
statute here does fit within the aggravated assault generic
definition, and while in New York one way that manslaughter

I156scos

could be accomplished is for a parent who harms a child.  In

the *Steinberg* case, as this Court mentions in its earlier

ruling, the parent had beaten the child and then failed to seek

medical care whether or not the parent is the one who applied

violent force was the issue addressed in the earlier ruling,

the parent by definition intends to cause serious physical

injury and the child suffers physical injury or death which is

generic aggravated assault.

So for those reasons the government submits that the

defendant is classified as a career offender under 4B1.2.

THE COURT:  Would it be helpful to defense counsel if

I printed out the *Lafave* excerpts that were cited?

MR. LARSEN:  No, thank you, your Honor.  I can respond

now.

Ms. Geddes' reference to the general principle of

criminal liability that one can be held accountable for an

omission is a point that we don't take issue with; but as Ms.

Geddes herself recognizes, these are general principles of law.

Our task here today is look at Mr. Scott's manslaughter offense

and specifically compare it to the generic offenses of

voluntary manslaughter, murder and aggravated assault.

Unless the Court prefers, I will go through the crimes

in that order.

THE COURT:  That will be fine.

MR. LARSEN:  As set out in our December 11th letter,

I156scos

1    your Honor, there are three differences between Mr. Scott's

2    manslaughter offense and the generic offense of voluntary

3    manslaughter.  I will note preliminary that Ms. Geddes cited

4    particular cases or particular statutes or a particular section

5    of the penal code, but that is not the inroad where we're

6    talking about generic offenses.  The second Circuit reaffirmed

7    this point in the *Jones* decision, which is in our brief and

8    which cites the Supreme Court's decision in *Taylor*.  The Court

9    there says, The generic definition of a crime is the sense in

10   which the term is now used in the criminal codes of most

11   states.

12          So we look to what the majority rule is, what the

13   general sense of the offense is and that is how we get the

14   generic definition, and we then take a particular defendant's

15   prior and compare it to that generic and see if it is a

16   categorical match, if it matches in every way.  If it is

17   broader, it doesn't count.  So starting again with the

18   voluntary manslaughter offense, we identified three differences

19   in our December 11th letter brief.  Three differences between

20   Mr. Scott's manslaughter offense and the generic offense of

21   voluntary manslaughter.

22          We noted the differences first.  Mr. Scott's

23   manslaughter offense does not require any intent to kill.

24   Secondly, there is no heat of passion requirement.  And

25   finally, it cannot be committed by omission, generic or

I156scos

1   voluntary manslaughter.  Now, your Honor, Ms. Geddes is

2   absolutely right that sometimes manslaughter can be committed

3   by omission and again as we note in our December 11th letter,

4   manslaughter by omission is generic involuntary manslaughter

5   and the Commission has now removed that as an offense that

6   could make someone a career offender.  We identified the three

7   differences.

8           Significantly, the government has not taken issue with

9   any of those three differences.  Coaching basis to reject the

10  three differences we address this in the letter of the third of

11  January.

12          Moving on to murder, your Honor.  Again, this is set

13  out in our papers of January 3rd; but in essence the generic

14  definition of murder, at least as described by the Third

15  Circuit, is either intentional killing and we know that doesn't

16  fit Mr. Scott's offense because there is no requirement of

17  intent to kill.  Or it is another type is felony murder, but we

18  also know from *Lafave* and the other authorities that

19  manslaughter does not count as a felony for the felony murder

20  doctrine.  If it did, then every manslaughter would be a murder

21  but we know there is a difference between those two crimes.

22  Again, these authorities are set out in our papers.

23          Finally, there is depraved indifference murder.  This

24  is where you show such an utter disregard for whether your

25  victim lives or dies, you will be deemed under the generic

I156scos

| | |
|---|---|
| 1 | definition of murder to have committed a murder.  Again, that |
| 2 | is not Mr. Scott's prior offense.  We have set out the |
| 3 | authorities under New York law showing that there is an intent |
| 4 | requirement of serious injury and that intent requirement is |
| 5 | fouled, but it does not rise categorically to a level of having |
| 6 | utter disregard for whether the victim lives or dies.  We have |
| 7 | cited the cases where an individual can punch someone else, |
| 8 | knock out teeth, break an arm or even bite them on the nose and |
| 9 | the New York courts say that is enough for serious injury.  But |
| 10 | biting someone on the nose or even breaking an arm or giving a |
| 11 | karate chop as another case shows does not rise to the level of |
| 12 | utter disregard for whether the victim lives or dies.  It is |
| 13 | therefore compared to generic depraved indifference murder |
| 14 | overbroad and cannot count under the categorical approach. |
| 15 | Finally, the government again missing the point of |
| 16 | what the generic analysis requires, the government hones in on |
| 17 | the federal murder statute, 1111, and says, Well, there is |
| 18 | authority showing that you can commit murder under that |
| 19 | particular federal statute if you simply have an intent to |
| 20 | serious injure.  Again, your Honor, one standalone statute does |
| 21 | not necessarily represent generic murder. |
| 22 | As again we have shown in our authorities, which again |
| 23 | the government has not disputed, most states today do not count |
| 24 | intent to injure murder as qualifying as murder.  They punish |
| 25 | it as something else.  So the federal statute although it may |

I156scos

1    encompass intent to injure murder, does not count as generic

2    murder because again we're comparing Mr. Scott prior to the

3    generic definition of murder.  All of this is set out in our

4    brief.  I am just reiterating it now for the Court's

5    convenience.

6            The final point, your Honor, is aggravated assault.

7    Now, again, I tried to make this as easy as possible because I

8    recognize this is an extremely complicated area of law.  All of

9    these categorical requirements trying to figure out what the

10   generic offense is, it is complicated.  I should note at this

11   point because it is complicated and we have a lot of clarity on

12   these questions, the rule of levity does come into play.  The

13   Second Circuit has not defined generic voluntary manslaughter,

14   murder or aggravated assault.  So if the Court finds that there

15   is doubt here as to what those generic offenses entail, the

16   rule of levity says that that doubt has to be resolved in

17   Mr. Scott's favor, and we cite the Second Circuit case

18   supporting that point.  We were doing a guidelines analysis.

19   If there is lack of clarity, levity comes into place, but we

20   submit we don't have to get as far as levity because it is

21   clear from the authorities that we cited, and the government

22   hasn't disputed, that the generic definitions of these crimes

23   do not match up with Mr. Scott's manslaughter prior as to

24   aggravated assault.

25           The government has nothing to say to the authority

showing that assault as commonly understood by its nature
requires proof of the use, attempted use or threatened use of
contact against another person.  Assault requires an overt act.
I am not saying that no state punishes an assault by omission,
but we're not looking here to find what one state may do in the
minority.  We're looking at what the generic offense entails,
and the generic offense as reflected by the codes of most
jurisdictions in this country is that the assault requires an
act.

        I was thinking back to my own first year of courts
class, assault is the apprehension or touching or apprehension
of touching.  There has to be some kind of contact.  Generic
assault simply cannot be committed by omission.  So when
considering what aggravated assault entails, we know there has
to be an assault because an aggravated assault is simply an
assault made worse by serious injury or the use of a deadly
weapon, but the baseline requirement is that there be an
assault.  The generic definition of an assault is an offense
that requires action.  Mr. Scott's prior differs from that
because it can be committed by omission.

        That is the point we're making, your Honor.  It is not
a categorical match when looking to the generic offense.  Sure,
some states may in the minority define assault as omission; but
we're not looking to find in all 50 jurisdictions if there is
one strange minority definition that lines up with what the

I156scos

 1    government has to say.  We look to the generic definition.  I

 2    put all these authorities in our brief showing that the generic

 3    definition assault requires action.  The Six Circuit case is as

 4    close as we can get to this particular case.  Because again the

 5    Sixth Circuit case is looking at a crime, essentially child

 6    abuse, that can be committed by omission; and the Sixth Circuit

 7    in *Cooper* said that is not a match with generic aggravated

 8    assault.  You cannot commit the generic version of this crime

 9    by doing nothing.  So it is not a matchup.

10            Your Honor, we explained how none of the offenses the

11    government has in the past and now tried to offer as

12    categorically fitting Mr. Scott's prior matches up.  They are

13    not categorical matches.  We have shown the authorities

14    supporting our position.  The government really has nothing to

15    say to dispute those authorities.  It only offers general

16    points of criminal liability, which are not relevant here.  The

17    question is specifically does Mr. Scott's manslaughter offense

18    categorically, meaning in every situation, match up with the

19    generic crimes here, and the answer is no because it is not a

20    match to any of these offenses.  He is not a career offender.

21    His range is 120 to 131 months.  He has already over-served

22    that term.  And for all the reasons we explained in our prior

23    submission, we ask the Court to impose a sentence of

24    time-served.

25            THE COURT:  Thank you.

1          Anything further, Ms. Geddes?

2          MS. GEDDES:  Your Honor, Mr. Larsen has argued that

3    most state statutes require an overt act for aggravated

4    assault, but the only cases cited in the brief -- he hasn't

5    mentioned any new ones here today -- do not address that issue.

6    They just address both mental states whether recklessness

7    enough where as the government has cited not just one state

8    statute but the Model Penal Code treatise Second Circuit

9    statement that is a general principle that omissions when there

10   is a legal duty in those specific instances can give rise to

11   the crimes just as an overt act can.

12          So the government believes that at the very least this

13   New York first degree manslaughter clearly falls under the

14   generic aggravated assault.  There is no reason to believe that

15   assault is different from murder or manslaughter, which can be

16   committed by omission or that it is different than battery

17   which can be committed by omission and the defendant hasn't

18   cited any cases that show that.

19          THE COURT:  Thank you.

20          I am going to make my ruling on this issue now.

21          I have considered thoroughly arguments made and makes

22   the following findings:

23          Mr. Scott's sentence was originally computed under

24   guidelines that included the residual clause in the career

25   offender provisions.  Although in *Beckles* the Supreme Court

I156scos

1     concluded that application of the residual clause of that

2     guideline did not raise constitutional issues, the Sentencing

3     Commission has removed that provision going forward as a matter

4     of policy, and Section 1B1.11 of the guidelines requires Mr.

5     Scott's new sentence must be calculated by reference to the

6     current guidelines, which no longer include the residual clause

7     of the career offender guideline.

8          The determination of the applicability of the career

9     offender guideline enhancements must therefore be based on

10    whether Mr. Scott's prior New York state convictions for

11    first-degree manslaughter under N.Y. Penal Law, Section

12    125.20(1) qualify as predicate "crimes of violence" that, with

13    the Title 18, U.S.C., Section 924(c) conviction for which he is

14    being resentenced today, place him in the career offender

15    category under the current version of the guidelines.

16         Under the Second Circuit's decision in *United States*

17    *v. Jones*, 2017 WL 4456719 (2d Cir. Oct. 5, 2017), when a state

18    statute is "divisible," the Court must employ a modified

19    categorical approach to determine whether a state conviction

20    qualifies as a predicate offense for a federal sentence

21    enhancement.  If the state statute criminalizes any conduct

22    that would not fall within the scope of the relevant Guidelines

23    provision, a conviction under the state statute is not

24    categorically a crime of violence and cannot serve as a

25    predicate offense.

1          The Court finds that N.Y. Penal Law, Section 125.20 is

2     "divisible."  See *Vargas-Sarmiento v. U.S. Dep't of Justice*,

3     448 F.3d 159, 167 (2d Cir. 2006).

4          According to the Certificates of Disposition proffered

5     by the Government in connection with Defendant's earlier motion

6     to vacate, Mr. Scott was convicted under subsection one of N.Y.

7     Penal Law, Section 125.20.  Thus, the Court's analysis focuses

8     on subsection one of N.Y. Penal Law, Section 125.20, because

9     the Court "must presume that the conviction rested upon nothing

10    more than the least of the acts criminalized."  *Moncrieffe v.*

11    *Holder*, 133 S.Ct. 1678, 1684 (2013).

12         The Court has already determined in its June 2, 2017

13    ruling vacating Mr. Scott's sentence under the Armed Career

14    Criminal Act, and that ruling is at Docket Entry 82, that Mr.

15    Scott's prior convictions are not "crimes of violence" within

16    the meaning of the force clause of the Armed Career Criminal

17    Act.  The ACCA's force clause is identical to the force clause

18    defining a crime of violence in current guideline section

19    4B1.2(a)(1).  Therefore, the prior manslaughter convictions do

20    not fit the guideline's force clause and thus cannot serve as a

21    predicate offense for a federal sentence enhancement under that

22    clause.  That is not controversial here but I am just stating

23    that for the record.

24         The remaining relevant provision of the current career

25    offender guideline, which is 4B1.2(a)(2), lists, among other

I156scos

enumerated offenses, "voluntary manslaughter," "murder," and

"aggravated assault" as qualifying crimes of violence.

Accordingly, the question for resolution today is whether

first-degree manslaughter, as defined by N.Y. Penal Law §

125.20(1) is either "voluntary manslaughter," "murder," or

"aggravated assault" within the meaning of the guideline.

     N.Y. Penal Law § 125.20(1) provides that a person is

guilty of manslaughter in the first degree when "with intent to

cause serious physical injury to another person, he causes the

death of such person or of a third person."  A "serious

physical injury" is defined under New York law as a "physical

injury which creates a substantial risk of death, or which

causes death or serious and protracted disfigurement,

protracted impairment of health or protracted loss or

impairment of the function of any bodily organ."  N.Y. Penal

Law Section 10.00(10).

     As the Second Circuit held in Jones, when the basis

for categorizing a prior conviction as a crime of violence is

that the offense is specifically enumerated as such in the

Career Offender Guideline, the Court compares the state statute

to the generic definition of the offense.  *Jones*, 2017 WL

4456719, at *6.  The "generic" definition of a crime is the

sense in which the term is now used in the criminal codes of

most states.

     I turn first turns to the Government's argument that

I156scos

subsection 1 of New York's first-degree manslaughter statute
fits within the generic definition of "voluntary manslaughter."
Amendment 798 to the guidelines revised the definition of
"crimes of violence" to exclude involuntary manslaughter and
only focus on voluntary manslaughter.  Therefore, the Court
looks to the general understanding of the elements of voluntary
manslaughter to define that term as used in the guidelines.

Voluntary manslaughter is commonly understood to
consist of intentional killing under the heat of passion or
similar provocation that mitigates but does not excuse killing.
See *LaFave*, 2 Substantive Criminal Law Section 15.2 (2d ed.),
which notes that in most jurisdictions, voluntary manslaughter
is defined as "an intentional homicide committed under
extenuating circumstances which mitigate, though they do not
justify or excuse, the killing").  See also 40 Am. Jur. 2d
Homicide § 48 (defining voluntary manslaughter as "a killing
committed in a sudden transport of passion or heat of blood,
upon reasonable provocation and without malice, or upon sudden
combat") and also Leonard B. Sand et al., Modern Federal Jury
Instructions paragraph 41.02, at 41-39 (1995) listing as
elements of voluntary manslaughter that the "defendant killed
the victim in a sudden quarrel or the heat of passion").

New York's first-degree manslaughter statute clearly
criminalizes conduct that falls outside of the scope of the
generic definition of voluntary manslaughter.  New York's

I156scos

first-degree manslaughter statute does not require an intent to
kill, only to cause serious physical injury.  And, as noted in
the Court's June 2, 2017, decision, it can be committed through
omission.  See *People v. Steinberg*, 79 N.Y.2d 673 (1992)
(finding that a parent's failure to fulfill a non-delegable
duty to provide his child with medical care, which is an
omission, can support a charge of first-degree manslaughter, as
long as there is sufficient proof that the defendant intended
to cause serious physical injury).  See also 6 N.Y. Prac.,
Criminal Law § 6:11 (4th ed.), which notes that "first degree
manslaughter generally applies to situations in which the
defendant intends to seriously harm, although not to kill, the
victim").

        The Court is not persuaded that first-degree
manslaughter is nonetheless a crime of violence by Judge Woods'
oral decision in *United States v. Castillo*, 16 Cr. 249.  The
sentencing Transcript is dated Oct. 6, 2016.  Judge Woods was
not presented with the question of whether subsection 1 of New
York's first-degree manslaughter statute fits within the
generic definition of "voluntary manslaughter" as enumerated in
§ 4B1.2(a)(2) of the November 1, 2016 Guidelines, which are
applicable to Mr. Scott's sentencing today.  Judge Woods'
inapposite and unelaborated comment that first-degree
manslaughter "clearly constitutes a crime a violence" under the
August 1, 2016 supplement to the Sentencing Guidelines, is not

1   persuasive when compared with the fruits of this Court's more

2   extensive analysis.

3          The Court also respectfully disagrees with Judge

4   Carter's determination in *United States v. Artis*, 15 Cr. 865,

5   the sentencing Transcript of Apr. 21, 2017, that first-degree

6   manslaughter is a crime of violence under the Guidelines.

7   Judge Carter's decision is also unelaborated and unexplained,

8   and is ambiguous as to the legal theory Judge Carter ultimately

9   relied upon.  Again, it is not persuasive in light of this

10  Court's more fulsome analysis.

11         The Court likewise does not find the only case cited

12  by the Government in support of its position to be persuasive.

13  That case was submitted in the original submission.  That case

14  did not address the distinction between subsections 1 and 2 of

15  N.Y. Penal Law Section 125.20 or otherwise parse the

16  particulars of either the New York statute or the generic

17  meaning of voluntary manslaughter.  See In re Wells' Will, 350

18  N.Y.S.2d 114, 117 (Surrogate's Court 1973).  And the proffer

19  here of a New York statute and Model Penal Code provision that

20  indicate that minimal requirements for criminal liability can

21  under those provisions include acts of omission is also

22  insufficient to persuade the Court that voluntary manslaughter,

23  indeed any of the crimes that I am going to discuss, can

24  categorically be committed by omission under the general

25  definitions of those crimes, but I will go on further

I156scos

explanation here.

So the Court concludes that subsection 1 of New York's first-degree manslaughter statute 125.20(1) is broader than the generic definition of voluntary manslaughter because it can support a conviction for conduct outside of the traditional scope of voluntary manslaughter. First degree manslaughter therefore does not qualify as a crime of violence by virtue of being "voluntary manslaughter" within the meaning of the career offender guideline.

I turn next to the Government's argument that subsection 1 of New York's first-degree manslaughter statute fits within the generic definition of "murder." The Court acknowledges that the Second Circuit has not yet directly addressed the generic definition of murder as listed in the current career offender Guidelines, and the Court thus looks to the Third Circuit's definition of murder in *United States v. Marrero*, 743 F.3d 389 (3d Cir. 2016). In *Marrero*, the Third Circuit held that "murder is generically defined as causing the death of another person either intentionally, during the commission of a dangerous felony, or through conduct evincing reckless and depraved indifference to serious dangers posed to human life."

The Court finds that subsection 1 of New York's first-degree manslaughter statute clearly criminalizes conduct that falls outside of the scope of the generic definition of

murder.  First, subsection 1 does not require an intent to
kill, and thus does not require "causing the death of another
person intentionally."  Second, first-degree manslaughter
cannot be a predicate felony for felony murder, see *LaFave*
Substantive Criminal Law Section 14.5, and thus subsection 1
criminalizes conduct outside of death caused during the
commission of a dangerous felony.  Third, the intent to cause
serious bodily injury required by subsection 1 encompasses
conduct that does not necessarily require the defendant to
demonstrate recklessness or a depraved indifference to human
life.

        For example, New York courts have found that a
defendant intended to cause a serious physical injury in cases
where the defendant bit another's nose causing a scar, where
the defendant caused the loss of four front teeth, and where
the defendant caused a broken arm.  See *People v. Felice*, 45
A.D.3d 1142 (App. Div. 2007); *People v. Everett*, 110 A.D.3d 575
(App. Div. 2013); and *People v. Mohammed*, 162 A.D.2d 367 (App.
Div. 1990).  These decisions demonstrate that an intent to
cause serious physical injury does not categorically constitute
an utter disregard for the value of human life.  Therefore,
subsection 1 of New York's first-degree manslaughter statute is
broader than the portion of the generic definition of murder
that criminalizes death caused through conduct evincing
reckless and depraved indifference to serious dangers posed to

I156scos

1  human life.

2          The Court does not find the Government's citation of

3  *United States v. Gonzalez*, 399 F. App'x 641 (2d Cir. 2010), and

4  *United States v. Regnier*, 44 F. App'x 524 (2d Cir. 2002)

5  persuasive in its analysis of the generic definition of murder.

6  Neither *Regnier* nor *Gonzalez* undertook an analysis of the

7  generic definition of murder or attempted to determine the

8  sense in which that term is now used in the criminal codes of

9  most states.  Each of those cases construes federal murder

10  statutes, and finds that the requisite malice required to prove

11  murder can be satisfied when a defendant intends to cause

12  serious bodily harm.  However, as one treatise acknowledges,

13  "most modern codes define murder as not including the

14  intent-to-do-serious-bodily-injury type."  *LaFave* Substantive

15  Criminal Law Section 14.3.  This treatise observes at note 4

16  that Section 210.2 of the Model Penal Code – which the Third

17  Circuit relies upon in formulating the generic definition of

18  murder in *Marrero* – was revised to delete the intent to injure

19  as an independent ground for culpability "on the judgment that

20  it is preferable to handle such cases under the standards of

21  extreme recklessness and recklessness contained in the murder

22  and manslaughter provisions, respectively."  That last clause

23  was a paraphrase on my part.

24          The Court therefore concludes that Subsection 1 of New

25  York's first-degree manslaughter statute 125.20(1) is broader

I156scos

than the generic definition of murder and thus is not a "crime
of violence" under the career offender guideline by reason of
qualifying as "murder."

Finally, the Court turns to the Government's argument
that subsection 1 of New York's first-degree manslaughter
statute fits within the generic definition of "aggravated
assault."

The Court acknowledges that the Second Circuit has not
yet directly addressed the generic definition of aggravated
assault as listed in the current career offender guidelines,
and thus looks to the generic definition adopted by the Sixth
Circuit and several other circuits, which closely tracks the
Model Penal Code.  See *Moring v. United States*, No. 16-5463,
2017 WL 4574491, at *3 (6th Cir. June 8, 2017); Model Penal
Code, Section 211.1(2).  Model Penal Code Section 211.1(2)
provides that a person is guilty of aggravated assault if he:
"(a) attempts to cause serious bodily injury to another, or
causes such injury purposely, knowingly or recklessly under
circumstances manifesting extreme indifference to the value of
human life; or (b) attempts to cause or purposely or knowingly
causes bodily injury to another with a deadly weapon."
Aggravated assault is necessarily a form of the broader crime
of assault, and so the Court must consider the elements of the
generic crime of assault.

Quoting from 6 Am. Jur. 2d Assault and Battery Section

I156scos

22, "Assault requires, in addition to intent, an overt act or
an attempt, or the unequivocal appearance of an attempt, with
force and violence, to do physical injury to the person of
another."  Although direct force against the victim is not
required, assault -- and therefore aggravated assault-requires
some affirmative act by the defendant.  See 6A C.J.S. Assault
Section 79.  Again I quote "Ordinarily, an overt act is an
essential element of an assault, and mere preparation or a
threat to commit and assault unaccompanied by physical effort
to do so, does not amount to an assault."

Because New York's first-degree manslaughter crime can
be committed through omission, see *People v. Steinberg*, 79
N.Y.2d 673 (1992), it criminalizes conduct outside the scope of
the generic definition of assault, and therefore aggravated
assault.  See also *United States v. Cooper*, 739 F.3d 873, 880
(6th Cir. 2014) which finds that a state statute which
criminalized a parent's failure to prevent an aggravated
assault against his or her child "encompasses more conduct than
generic aggravated assault."

Thus, after considering each of the Government's
arguments, the Court concludes that the Guidelines' Career
Offender enhancement is inapplicable here.  The Court finds
that Mr. Scott's base offense level is 20, that his total
offense level is 17, and that his criminal history category is
IV.  This yields an advisory range of 37-46 months, which when

I156scos

```
1    added to the 84-month term mandated by Mr. Scott's Section

2    924(c) conviction produces a total range of 121-130 months.

3

4

5

6            Now, I need to go back to a couple of housekeeping

7    issues.

8            Ms. Geddes, in Footnote 6 to your December 11th

9    submission you cited paragraph 71 of the PSR as computing the

10   noncareer offender guideline as 29 with a criminal history

11   category of six for a guidelines of 924(c) of 151 to 188.  It

12   seems by my reading of the PSR that that paragraph's

13   computations are based on the 4B1.1 career offender guidelines

14   computation that is in paragraphs 27 to 30 of that report and

15   that paragraph 71 also reflects an incorrect noncareer offender

16   criminal history category computation of six.  Paragraph 46 of

17   the PSR puts the noncareer offender criminal history category

18   computation at four.

19           So it seemed to me as I said a few minutes ago that

20   based on paragraphs 19 to 26 of the PSR and paragraph 46, the

21   defense is correct in concluding that the correct noncareer

22   offender guideline for 924(c) would be 17 with criminal history

23   category four.  And so if I've misread PSR, let me know.

24           MS. GEDDES:  No, your Honor.  I agree with that

25   calculation.  My footnote is that that paragraph of the PSR
```

I156scos

1    we're referencing was within the career offender guideline.

2    There was subsection C, which sort of has enhanced career

3    offender guidelines for someone who is also convicted of

4    924(c).  So that is what that calculation was based on your

5    Honor's ruling that he is not under the career offender

6    guideline at all, then I agree with the calculations you have

7    just set forth.

8                 THE COURT:  Thank you.

9                 Is the government applying to have Mr. Scott credited

10   with the third point for acceptance of responsibility?

11                MS. GEDDES:  Yes, your Honor.

12                THE COURT:  That application is granted and that gets

13   us to the net figure of 17.

14                Did either side have any further issues or objections

15   with respect to the PSR?

16                MS. GEDDES:  None from the government.

17                MS. WILLIS:  No, your Honor.

18                THE COURT:  So I will direct that the PSR be amended

19   to delete the career offender enhancement calculations in

20   paragraphs 27 through 30 and to reflect in paragraph 31 that

21   the total offense level is 17.  I will also direct that the

22   second sentence of paragraph 46 be deleted and that the

23   reference to Mr. Scott's criminal history category in that

24   paragraph be amended to be Roman four and I will direct that

25   the second and third sentence of paragraph 45 be deleted

I156scos

because the guidelines Section 4A1.1(e) that is referenced in
that paragraph was stricken by Amendment 742 to the guidelines
effective November 1st, 2010, and the total number of criminal
history points in paragraph 46 will therefore be amended to
seven.

          I am now ready to hear general sentencing
argumentation.

          Ms. Willis, would you start?

          MS. WILLIS:  Thank you, your Honor.

          Your Honor, as I wrote in our submission, I believe
this Court is in a unique position with respect to Mr. Scott.
Typically when there is a sentencing hearing, the Court applies
educated guesswork to try to determine how much punishment is
sufficient but not greater than necessary to achieve the
sentencing objectives.  The Court uses all of its resources and
to come one a number and hopes that number is enough.

          Here we have a situation where the Court has more
information than you would normally have.  We have a passage of
time and we have seen and the Court is able to see the effect
of the passage of time has brought on Mr. Scott as someone who
now stands before you having served 11 years and two months and
five days of his sentence.  I think that his behavior in the
last 11 years is particularly informative because choices and
decisions that he made, he made without any thought that it
would be reviewed later.  This is not a situation where he was

I156scos

 1    serving a state sentence and thought perhaps he might be up for

 2    parole and so takes classes or is doing courses or working

 3    might somehow positively reflect on him and allow him to lessen

 4    his sentence.  He fully expected that he would be serving the

 5    entirety of his 22 years and despite that he made positive

 6    decisions.  He wanted to move forward.  He wanted to learn from

 7    his mistakes and not repeat them.

 8          So you have before you someone who is older, wiser

 9    than he was 11 years ago.  Mr. Scott fully appreciates the

10    wrongs of his actions.  He wrote about that in his letter,

11    which is an exhibit to the Court.  He also has reflected in a

12    way that he hadn't not just on this case but the choices that

13    he has made and what it has meant to his life, to his family

14    life.

15          I do want to pause for a moment and point out the

16    family members who are here today to support Mr. Scott.  His

17    sister, who was here two weeks ago and offered Exhibit A, the

18    submission, the letter in support; his brother Kenneth is

19    sitting on the end; his niece, India, who was also here two

20    weeks ago; and his nephew Darius.

21          THE COURT:  Thank you all for being here and thank you

22    for the letters that I received.

23          MS. WILLIS:  So Mr. Scott is someone who by nature of

24    in part his age reflecting back on his life, he sees that now

25    he is someone who is 52 years old and that he has squandered

I156scos

1  the better part of his life through his choices.  He now has a

2  perspective that age and wisdom provides to realize that even

3  if he is blessed with a long life, more of it has passed than

4  what he likely has in front of him.

5       So he is committed to not repeating the mistakes of

6  the past and I think that we also have that we did not have 11

7  years ago is that Mr. Scott has a detailed reentry plan.  When

8  he left prison after his last state sentence, he had mental

9  health issues that were not addressed.  He had a substance

10  abuse issue, which had not been quelled by his time

11  incarcerated in the state.  He was able to get ready access to

12  narcotics and left prison with his addiction fully in fact and

13  without any supportive services.

14       Now Mr. Scott has years of medication and of

15  treatment.  And through the reentry plan and the social worker,

16  who has been working with Mr. Scott and is also here to support

17  him today, through working together they have come up with a

18  comprehensive plan so that when Mr. Scott is released, he has a

19  place to go to.  He will be able to live with his sister Kathy.

20       He has mental health services that he will be able to

21  engage with.  They have taken the steps to secure health

22  insurance for him so he will be able to pay for those services.

23  He will have the supportive services of the Federal Defenders

24  social work office.  We continue to work with clients after

25  they are released.  He would have obviously supervision through

I156scos

1   federal probation which is obviously more comprehensive and

2   more focused on ensuring success than traditional patrol would

3   be.

4          Having those things in place puts him in a completely

5   different position he was in when he emerged from prison on his

6   last state sentence.  He has those things in place.  He has

7   family to support him.  Again, what I think is crucial is that

8   he has transformed mentally.  He has used these 11 years to

9   reflect on his choices, on his life and he is committed to not

10  wasting anymore time, to not making anymore decisions that

11  would put him in jeopardy of going back to the penitentiary.

12         He realizes that at 52 if he were to be imprisoned

13  again that is virtually the end of his life.  He has come up

14  with things that he wants to accomplish and he understands that

15  maintaining mental health, maintaining his sobriety that those

16  things are crucial to the things that he wants to accomplish.

17  So having that commitment and having the support and having the

18  things in place to assist him with that commitment let's us

19  know that the aims of punishment have been accomplished.  He

20  has served a sentence which is above his guidelines range,

21  several months above what the guidelines recommend taking into

22  account is criminal history and taking into account conduct

23  which is obviously serious.  He has served more than that

24  sentence.  So the punishment is one that is an appropriate

25  punishment for the crime.

I156scos

He has been deterred.  The passage of time, the
effect, he speaks to the Court about the loss of various family
members.  He is extremely fortunate to have the support of
family that year after year they have written to him and
supported him.  They left their jobs and come here to show you
that support.  He is fortunate in that respect.  He has also
lost family, family members who died while he was incarcerated
and as he writes in his letter being unable to spend those last
moments with them, being able to say good bye to them, being
able to go to their funeral, being able to go to the gravesite.
That is something that has changed him.  Understanding what his
choices have done to him and to his family is something that he
has affected him greatly.  So he has been deterred.

Lastly we'll talk about rehabilitation.  He has
demonstrated through his primarily good conduct while he was in
the Bureau of Prisons through taking courses, through working,
through engaging in mental health treatment.  The continuation
of his rehabilitation would be better accomplished in the
community connecting him with the mental health sources that we
have cited in the reentry plan, connecting him with the
vocational services that we have cited in the reentry plan, a
way to continue his rehabilitation and to allow him to be
released and to engage those supportive services that we have
laid out.

So in sum, your Honor -- I don't want to belabor what

I156scos

1    I know you have already read in the submission -- he has been

2    punished and he has been deterred and he has been

3    rehabilitated.  He has served above a guideline sentence and

4    his sentence of time-served is the just and appropriate one and

5    that is what I would ask you to sentence Mr. Scott to.

6              THE COURT:  Thank you, Ms. Willis.

7              Ms. Geddes.

8              MS. GEDDES:  Your Honor, the government rests on its

9    prior submission.

10             THE COURT:  Thank you.

11             Mr. Scott, would you like to say anything on your own

12   behalf before I decide on your sentence?

13             THE DEFENDANT:  Well, your Honor, as you know from my

14   past, I always speak at the sentencing hearing.

15             THE COURT:  I am sorry?

16             THE DEFENDANT:  I always speak.  Yes, I do.

17             THE COURT:  I have been looking forward to hearing

18   from you.  I am going to ask you to speak up a little bit more

19   and pull that microphone a little bit closer to you so we hear

20   every word.

21             THE DEFENDANT:  I have a lot to say, but I am not

22   going to say.  On advice of counsel, I am going keep it brief.

23   There is so much I would like to say of course.  What I want to

24   most importantly express is my regret for a crime I committed

25   11 years ago.  I am sorry for that.  Despite being on drugs

1    that day, there was no excuse for what I did.  If I wasn't on

2    drugs that day, I would have never committed that crime.  I am

3    pissed, ashamed of it myself to this day, but I am sorry for

4    that.

5            I am not the same man I was 11 years ago.  I would

6    like to have a chance to start a new life, make a better life

7    for myself.  I am not going to go much further.  I am not going

8    to use this as a forum to advocate for a prison reform.  I will

9    leave it at that.

10           THE COURT:  Thank you, Mr. Scott.  It is good to hear

11   from you and I was glad to receive the two letters that you

12   prepared for me and I read beforehand.

13           THE DEFENDANT:  Yes, I didn't know -- I thought it was

14   private actually what I wrote.  I didn't know --

15           THE COURT:  Anything that you send to me isn't

16   private.  Anything the Court considers has to be shared.

17           THE DEFENDANT:  I was told that, yes.

18           THE COURT:  There is nothing in that letter to be

19   ashamed of.

20           THE DEFENDANT:  Thank you.

21           THE COURT:  Thank you.  Please be seated.

22           I have read very carefully everything that was

23   submitted to me before today and I have listened very carefully

24   to everything that has been said here today.  I adopt the

25   factual recitations set forth in the presentence report with

I156scos

1    the guideline analysis amendments that I detailed on the

2    record.

3           The Court has discretion taking into account the

4    applicable statutory provision in exercising its power under

5    Section 3553(a) of Title 18 to determine the particular

6    sentence to be imposed in each particular case.  Section

7    3553(a) requires the Court to consider a number of specific

8    factors and sentencing goals.  These includes the nature and

9    circumstances of the offense and the defendant's history and

10   characteristics, the need for the sentence imposed to reflect

11   the seriousness of the offense, promote respect for the law,

12   and provide just punishment, deterrence, protection of the

13   public, and provision of needed training or care or treatment

14   to the defendant in the most effective manner.  The Court also

15   considers the types of sentences that are available and the

16   applicable provisions of the guidelines as well as the need to

17   avoid unwarranted sentencing disparities among defendants with

18   similar records who have been found guilty of similar conduct.

19   The Court also considers where appropriate the need to provide

20   restitution to victims, but that is not an issue here.

21           The law requires the Court to impose -- actually, let

22   me confirm that since I didn't ask you that on the way along.

23           Ms. Geddes, what is the government's position as to

24   restitution and forfeiture?

25           MS. GEDDES:  The government is not seeking either,

I156scos

your Honor.

THE COURT:  Thank you.

The law requires the Court to impose a sentence that
is sufficient but not greater than necessary to comply with
these sentencing purposes.  As to the sentencing guidelines as
explained earlier, I conclude that the applicable guideline
offense level is 17 based on the revised computations that I
went over in detail earlier and that the applicable criminal
history category is four.

The Court also adopts the grouping of charges analysis
as set forth in the presentence report.  Accordingly, the
advisory guideline range for custodial sentence including the
mandatory 84-month component related to the 924(c) conviction
is 121 to 130 months of imprisonment.  I have used the
November 1, 2016 edition of the guidelines manual in making
these determinations.

I find no grounds for a departure from this guideline
range and I have also considered carefully all of the requisite
statutory sentencing factors of Section 3553(a) and all of the
facts that have been put before me in light of those factors
including the fact that Mr. Scott has been in custody since
September 26th, 2006 for a total of approximately 134 months, a
time period that exceeds the applicable guidelines range.

I will address briefly the 3553(a) factors.  As to the
nature and circumstances of the offense, this was a very

1   serious offense.  Mr. Scott and another individual robbed three

2   employees of jewelry store at gunpoint.  Mr. Scott pointed the

3   gun at the store owner.  It was fortuitous that no one was

4   injured during the robbery.  Either Mr. Scott forced his

5   codefendant to participate or he lied under oath about having

6   done so in connection with the first round of the plea and the

7   first round of sentencing and so altogether the circumstances

8   are most serious and are not ones that Mr. Scott should be

9   proud of and I hear from him today and see in his letter that

10  he is remorseful and there are ones that require serious

11  punishment and deterrence.

12          As to Mr. Scott's own history and characteristics, he

13  had a difficult and troubled childhood and has the history of

14  mental illness and drug addiction which were left untreated for

15  many years including while he was incarcerated in the state

16  prison system.  I note that he had been working hard over the

17  last 11 years to overcome his addiction and mental health

18  problems and to reestablish his ties with his family and

19  success of his efforts with respect to his family as shown here

20  in court today and in the letters that I received and by all

21  accounts he has lived a clean life and were to reinforce his

22  separation from his addiction while he has been in federal

23  prison.

24          He has completed numerous educational programs and

25  maintained a record without serious adverse incidents while in

I156scos

BOP custody.  He has maintained a close relationship with his

younger sister and niece, who both describe him as

hard-working, caring, and devoted to his family.  His family

have demonstrated a strong commitment to helping him after he

is released.  I believe that his remorse is sincere and his

letters indicate insight and positive realistic future goals.

He does have a history of violent offenses.  In the

past he has stabbed a person and shot another person to death.

Those crimes were committed 30 years ago, though.  He

represents that he was using drugs when he committed the crime

for which he is being sentenced today.  He is now 52 years old

and Mr. Scott exhibits significant changes in thinking,

attitude and behavior.  I also note that studies confirm that

the recidivism risk diminishes significantly after the age of

50.

As I say, turning to this specific goals of

sentencing, it is significant that Mr. Scott has demonstrated

genuine remorse for his choices and acknowledges the pain that

his actions have caused the victims of the robbery and his

family and that he has been himself made even more acutely

aware of the loss of time caused by his choices through the

loss of several family members including his father while he

has been incarcerated.

He demonstrates that he understands his actions

deprived him of a normal life and he made the commendable

I156scos

 1    decision to spend his time within the Bureau of Prisons in a

 2    productive way including by developing a trivia game that is

 3    used by others and by taking classes in various skills.  His

 4    reflections now are made with the benefit of several years of

 5    sobriety and mental health treatment.  He acknowledges the need

 6    for ongoing treatment and he collaborated constructively with

 7    the Federal Defenders' social worker to develop a plan for

 8    housing and employment after his release.

 9            So having considered all of these factors including

10    the nature and seriousness of the crimes, Mr. Scott's own

11    criminal history, his personal characteristics and his work

12    over the last 11 years to overcome serious issues in his life,

13    the Court finds that the guideline range included, which has

14    now been exceed, a sentence that is reasonable, appropriate and

15    no greater than necessary to satisfy the statutory purposes of

16    sentencing.  So I will now state the sentence that I intend to

17    impose.

18            Mr. Scott, would you please stand as well as Ms.

19    Willis and Mr. Larsen.

20            Mr. Scott, it is the judgment of this Court that you

21    are to be sentenced to time-served on each of your counts of

22    conviction to be followed by five years of supervised release

23    of on each count to run concurrently.  The total sentence as to

24    custody is time-served total supervised release term is five

25    years, which will give you a supervision, support and

1    accountability as you start your new life in community and

2    cement the foundations for a lawful constructive life going

3    forward.

4           The standard conditions of supervision 1 through 13 as

5    detailed in the sentencing guidelines manual will apply.  These

6    will be written out specifically in the judgment that I sign

7    and the Probation Department will explain them to you

8    specifically as well.  I am sure that your lawyers will have

9    something to say to you about them.

10          You'll also be subject to the following mandatory

11   conditions.  You not commit another federal, state or local

12   crime.  You must not illegally possess a controlled substance.

13   You must not possess a firearm or destructive device.  I will

14   suspend the normal mandatory drug testing condition because I

15   will impose a special condition requiring drug treatment and

16   testing.  You must cooperate in the collection of DNA as

17   directed by the authorities.

18          You must meet the following special conditions:  You

19   must participate in an outpatient substance abuse treatment

20   program approved by the Probation Office.  This program may

21   include testing to determine whether you have reverted to the

22   use of drugs or alcohol.  The Court authorizes the release of

23   available drug treatment evaluations and reports including the

24   presentence report to the substance abuse treatment provider as

25   directed by the Probation officer.  You'll be required to

1    contribute to the cost of the services rendered in the form of

2    a copayment in an amount determined by the Probation officer

3    based on your ability to pay or the availability of third-party

4    payment.

5          You must participate in an outpatient mental health

6    treatment program approved by the Probation Office.  You must

7    continue to take any prescribed medications unless otherwise

8    instructed by the healthcare provider.  You must contribute to

9    the cost of the services rendered that are not covered by

10   third-party payment if you have the ability to pay.  And,

11   again, this is something you'll work through with your

12   Probation officer.

13         The Court authorizes the release of available

14   psychological and psychiatric evaluations and reports including

15   the presentence report to the healthcare provider.  You must

16   submit your person, your residence, your place of business,

17   your vehicle, and any property, computers, electronic

18   communications, data storage devices and/or other media under

19   your control to a search on the basis that the Probation

20   officer has reasonable suspicion that contraband or evidence of

21   a violation of the conditions of release may be found.  Any

22   search must be conducted at a reasonable time and in a

23   reasonable manner.  Failing to submit to a search may be

24   grounds for revocation of supervised release.  You must inform

25   any other residence that the premises may be subject to search

1    pursuant to this condition.

2          You must report to the nearest Probation Office within

3    72 hours of release from custody.  I am hopeful you will be

4    released this afternoon and in time to go to the Probation

5    Department.  Officer Calderon of the Probation Department is

6    here in court today and she will also be able to speak with the

7    social worker about the plans that you devised and also with

8    your family.  I hope this is how this will all work.

9          You'll be supervised by your district of residence.

10          I will order you to pay a fine in the amount of $325.

11   I understand that you have paid $325 already.  The payments

12   that you have made toward previously imposed fine to date will

13   be applied to the payment of the $325 fine.

14          I will also order that you pay to the United States

15   the mandatory special assessment of $300, which is $100 for

16   each of your three counts of conviction.  I understand that you

17   have paid that as well and the payments that you made in the

18   past will be credited to this $300 special assessment.

19          I believe that this sentence as a whole is reasonable,

20   appropriate, sufficient and know greater than necessary to

21   satisfy the statutory purposes of sentencing, which include

22   punishment and deterrence.  I also must note that you have to

23   inform the Probation Department of any change in your financial

24   circumstances.

25          Does either counsel know of any legal reason why the

1    sentence should not be imposed as stated?

2          MS. GEDDES:  No, your Honor.

3          MS. WILLIS:  No, your Honor.

4          THE COURT:  The sentence as stated is imposed.

5          I must say something important to you to appeal

6    rights.  To the extent you have not given up your right to

7    appeal through your guilty plea, you have the right to appeal

8    this sentence.  If you are unable to pay the cost of an appeal,

9    you may apply for leave to appeal in forma pauperis.  At your

10   request, the Clerk of Court will file a notice of appeal for

11   you.  Any notice of appeal must be filed within 14 days of the

12   judgment of conviction.  So be sure to touch base with your

13   attorneys as well.  The deadline is short.

14         Ms. Geddes, are there remaining and counts or

15   underlying indictments that need to be addressed?

16         MS. GEDDES:  I would imagine they would have been

17   dismissed the last time, but in abundance of caution we move to

18   dismiss any open counts.

19         THE COURT:  Since I vacated the prior sentence and

20   judgment I think I need to reflect it again here.  That

21   application is granted.

22         I would like to say a few more words to Mr. Scott and

23   his family.  I thank you all in advance for listening.  This

24   has been a long road.  Not as long a road as it could have been

25   and that is a very good thing.  You have shown in the 11 years

I156scos

1    that you served that you do want to be a different person and

2    you want to live as a different person.  The changes in the law

3    have given you the opportunity to move on those intentions in

4    the world 10 years earlier than you would have otherwise been

5    able to do, and I am glad to have been able to reach this

6    result today.

7              I urge you for the rest of your days to recognize that

8    every single thing you do is a choice and every choice that you

9    make has consequences.  So think in advance of your actions

10   about their potential consequences and make sure that

11   everything you do and every remaining moment you walk on this

12   earth and breath the air of the earth that what you do is

13   consistent with the honor that you should show yourself as a

14   human being, the honor which you hold your family, and the

15   positive role that you want to play in the world.

16             Given the way that you have lived over the last 11

17   years and given what you told me about yourself and what you

18   want to do, given the support that you have of your family and

19   the careful planning that you have done with the social worker

20   and the work that you will be doing with probation, I know that

21   you can succeed.  So believe in your heart that you can succeed

22   as well and live that success every single day.  Make sure that

23   you are making progress every day toward the goals that you

24   have set for yourself.

25             I see that you are loved very much by for family.

I156scos

1    That makes you rich.  Treasure that and treasurer your freedom.

2    The keys to your freedom is very much in your own hands because

3    they depend on what you do.  The love of your family is in your

4    hands as well.  So they love you unconditionally, reciprocate

5    that love and encourage them in every way and they will

6    encourage you in every way.  I wish you and your family

7    continued strength and success together.

8            You'll have the guidance and support of the Probation

9    Department in reestablishing your day-to-day life.  Officer

10   Calderon and her colleagues are in the job that they do because

11   they are genuinely committed to helping people succeed in

12   changing their lives.  Being under supervision isn't easy, but

13   know that they are not there to hassle you.  They are there to

14   help you grow and help you live in a way that is right and is

15   as successful as it can be.  Please take the supervision

16   requirement in that spirit.

17           I have to caution you that you have to comply strictly

18   with all of the conditions that I have set for your supervised

19   release.  If you are brought back before me for violating any

20   of those conditions, I may send you back to prison.  So please

21   don't ever put me in a position of having to make that choice.

22           I know that you can succeed.  And as good as it is to

23   see you today, I hope I never see you again because if I never

24   see you again that means you are succeeding.  I would ask that

25   specifically promise your family face-to-face and promise

I156scos

1    yourself that you'll never again do anything that even can put

2    you at risk of going back to prison.  You know how precious

3    freedom is and you know how precious you are to them.

4         I thank you all for listening.  I also thank counsel

5    for their work, for their thoughtful advocacy on these

6    difficult legal issues and on the the fundamental question of

7    justice here.  So thank you for helping me reach the right

8    decision.

9         I will direct that an amended copy of the presentence

10   report be prepared for the Sentencing Commission.  All other

11   copies of the report must remain confidential.  If an appeal is

12   taken, counsel on appeal is to be permitted access to the

13   report.  Of course the corrected copy will go to counsel as

14   well.

15        Now, you can be seated.

16        I have a couple of practical questions and I will have

17   sign an order here.

18        Practical question:  Are there clothes and shoes and a

19   warm coat for Mr. Scott?

20        UNIDENTIFIED PERSON:  No.

21        MS. WILLIS:  We do have a clothing closet in our

22   office.  We do sometimes get clothes for that.  So we can check

23   what sizes we have and coordinate with the family.

24        THE COURT:  Ms. Calderon.

25        OFFICER CALDERON:  Your Honor, we also have a closet

I156scos

1    as well and we can find something.

2              THE COURT:  We have to make Mr. Scott is physically

3    equipped to go outside assuming there are no other impediments.

4              Now, the Marshal service will be taking Mr. Scott back

5    for processing and will have to check to make sure there are no

6    warrants or anything else that would impede release.

7              So, counsel, the marshals will inform the family of

8    what to expect and how it is you can meet up again.  So I thank

9    you all in advance for doing that.

10             Ms. Ng, would you print out the order that I have to

11   sign.

12             I have signed an order that says, Pursuant the

13   sentence of time-served imposed today, the defendant, Gerald

14   Scott, is released from the custody of the U.S. Marshal

15   Service.

16             I think that is the right way to do it even though he

17   is in BOP custody now and out.  It says time-served and I hope

18   that will suffice.

19             I would ask the marshals to let Mr. Scott acknowledge

20   his family as he leaves the courtroom and I thank you for

21   making that accommodation as well.

22             So everyone be well, happy new year, and do good in

23   the world.

24                               o0o

25